UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

CHARLES TUBBINS,

                            Plaintiff,

            v.

GARY HACKBUSH, Individually and in his
  capacity as an Assistant District Attorney of
  the Erie County District Attorney's Office,
FRANK A. SEDITA, III, Individually and in his
  capacity as District Attorney of the Erie County
  District Attorney's Office, and
THE ERIE COUNTY DISTRICT ATTORNEY'S
  OFFICE,

                         Defendants.
_____

|  |  |
|---|---|
| | **DECISION**<br>**and**<br>**ORDER** |
| | **14-CV-00403F**<br>**(consent)** |

APPEARANCES:          LAW OFFICE OF WAYNE C. FELLE, P.C.
                           Attorneys for Plaintiff
                           WAYNE C. FELLE, and
                           ELIZABETH A. BRUCE, of Counsel
                           6024 Main Street
                           Williamsville, New York  14221

                           MICHAEL A. SIRAGUSA
                           ERIE COUNTY ATTORNEY
                           Attorney for Defendants
                           MICHELLE M. PARKER
                           First Assistant County Attorney, of Counsel
                           95 Franklin Street
                           16th Floor
                           Buffalo, New York  14202

## <u>JURISDICTION</u>

On July 23, 2014, the parties to this action consented pursuant to 28 U.S.C. §

636(c) to proceed before the undersigned.  The matter is presently before the court on

Defendants' motion for summary judgment (Doc. No. 22), filed February 29, 2016, and

Plaintiff's motion for discovery (Doc. No. 24), filed March 21, 2016.

## BACKGROUND

On April 29, 2014, Plaintiff Charles Tubbins ("Plaintiff" or "Tubbins"), filed in New York Supreme Court, Erie County, a complaint (Dkt. 1) ("Complaint"), alleging, pursuant to 42 U.S.C. § 1983 ("§ 1983"), Defendants Erie County District Attorney's Office ("DA's Office"), Erie County District Attorney Frank A. Sedita, III ("Sedita"), and Assistant Erie County District Attorney Gary W. Hackbush ("Hackbush") (together, "Defendants"), violated his civil rights in connection with the arrest and detention of Plaintiff on an indictment for a murder for which Plaintiff was later exonerated by DNA evidence. Plaintiff asserts seven claims for relief including (1) unspecified constitutional violations against "the individual unnamed police officer defendants," Complaint ¶¶ 25-26 ("First Claim"); (2) violations of § 1983 against the DA's Office, *id.* ¶¶ 27-33 ("Second Claim"); (3) false arrest and imprisonment against Defendants Sedita and Hackbush (together, "Individual Defendants"), *id.* ¶¶ 41-47 ("Third Claim"); (4) negligent hiring, training and retention against Individual Defendants, *id.* ¶¶ 48-58 ("Fourth Claim"); (5) intentional infliction of emotional distress against Individual Defendants, *id.* ¶¶ 59-63 ("Fifth Claim"); (6) malicious prosecution and abuse of process against Individual Defendants, *id.* ¶¶ 64-68 ("Sixth Claim"); and (7) libel and slander against Individual Defendants, *id.* ¶¶ 69-80 ("Seventh Claim").  On May 28, 2014, Defendants removed the action to this court asserting federal question jurisdiction pursuant to 28 U.S.C. § 1331.

On February 29, 2016, Defendants filed the instant motion for summary judgment (Dkt. 22) ("Defendants' motion"), attaching the Attorney Declaration of Assistant Erie County Attorney Michelle Parker in Support of Defendants' Motion for Summary Judgment (Dkt. 22-1) ("Parker Summary Judgment Declaration"), the Memorandum of

Law in Support of Defendants' Motion for Summary Judgment (Dkt. 22-2) ("Defendants' Memorandum"), Defendants' Local Rule of Civil Proc. 56(a)(1) Statement of Material Facts as to Which No Genuine Issue of Fact Exists (Dkt. 22-3) ("Defendants' Statement of Facts"), and exhibits (Dkts. 22-4 through 22-7) ("Defendants' Exh(s). __").  On March 21, 2016, Plaintiff moved pursuant to Fed.R.Civ.P. 56(d) to compel discovery to enable Plaintiff to oppose Defendants' motion ("Plaintiff's motion"),[1] supported by the Memorandum of Law (Dkt. 24) ("Plaintiff's Memorandum"), and attaching exhibits A through G (respectively, Dkts. 24-1 through 24-7) ("Plaintiff's Exh(s). __").  On March 31, 2016, Plaintiff filed Plaintiff's Memorandum of Law in Opposition to Defendants' Motion for Summary Judgment (Dkt. 26) ("Plaintiff's Response"), attaching the Declaration of Wayne C. Felle, Esq. in Opposition to Defendants' Motion for Summary Judgment (Dkt. 26-1) ("Felle Declaration"), Plaintiff's Opposition Statement Pursuant to Rule 56(d)(2) (Dkt. 26-2) ("Plaintiff's Opposing Statement of Facts"), and exhibits A through F (respectively, Dkts. 26-3 through 26-8) ("Plaintiff's Response Exh(s). __").  On April 14, 2016, Defendants filed the Attorney Declaration of Assistant Erie County Attorney Michelle Parker in Opposition to Plaintiff's Discovery Motion (Dkt. 27) (Parker Response Declaration"),[2] and the Attorney Declaration of Assistant Erie County Attorney Michelle Parker in Reply to Plaintiff's Opposition to Defendants' Motion for Summary Judgment (Dkt. 28) ("Parker Reply Declaration").   Oral argument was deemed unnecessary.

---

[1] Plaintiff's motion is not accompanied by an actual notice of motion but only by papers supporting such motion.  *See* Text Order entered March 29, 2016 (Dkt. 25) (recognizing that Plaintiff, by papers filed March 21, 2016, moved for discovery pursuant to Fed.R.Civ.P. 56(d)).
[2] To correct an electronic filing error, Parker's Response Declaration was re-filed on April 15, 2016  (Dkt. 30).

Based on the following, Defendants' motion is GRANTED; Plaintiff's motion is DENIED.

## **FACTS**[3]

On November 10, 2012, Rashiene Carson ("the victim"), was traveling with three others in a silver Pontiac Aztec ("the vehicle"), when they stopped for gas at the Getty Gas Station & Convenience Store ("the store"), at 595 Ontario Street, in Buffalo, New York.  The victim was seated in the backseat on the passenger-side of the vehicle.  The store's security video camera captured images ("the security video"), at 12:47 A.M. showing someone using his bare hand to operate the door handle ("the door handle") to open the vehicle's rear passenger-side door, make grabbing motions at the seated passenger, raise his arms and point directly at the passenger before turning and fleeing on foot westbound on Ontario Street while the victim exited the vehicle from the rear passenger-side seat, stumbled toward the store and collapsed and died on the sidewalk in front of the store ("the shooting" or "the homicide").  In investigating the crime scene, Buffalo Police Department ("the police") Crime Scene Unit ("CSU") Detective Christopher Gerace ("Gerace"), swabbed the door handle, obtaining a DNA sample that was submitted to the Erie County Central Police Services ("CPS") Forensic Lab ("the Lab") for analysis.  The police also obtained fingerprints from the door handle.

Before obtaining any analysis results of the DNA sample or the fingerprints, the police, based on the security video, located and interviewed four eyewitnesses to the shooting.  "FM," who was outside the store at the time of the shooting, stated that just before the shooting, he asked the shooter for marijuana, which request was denied.  As

---

[3] Taken from the pleadings and motion papers filed in this action.

FM walked past the shooter, FM looked back and observed the person who had requested marijuana shoot the victim.  FM positively identified the shooter from a photo array as Charles Tubbins ("Plaintiff" or "Tubbins").  "DR," who was at the store's entrance when the shooting occurred, told the police that through mutual friends he was acquainted with the shooter who DR positively identified through a photo array as Tubbins.  Both FM and DR were fearful and reluctant to identify Tubbins.  "LP," who was inside the vehicle when the victim was shot, tentatively identified Tubbins from a photo array, stating he needed to see Tubbins in person to be certain.  The store's cook, "JE," identified Tubbins from the security video as a regular customer who was inside the store moments before the shooting.

On November 12, 2012, Tubbins's brother ("brother"), filed a police report alleging he had been robbed by Tubbins.  The responding police detectives found Tubbins and his girlfriend ("J.T."), at the North Buffalo Community Center ("the Community Center"), and Tubbins agreed to speak with the detectives about the alleged robbery.  The detectives drove Tubbins and J.T. to the Buffalo Police Department's Homicide Bureau ("Homicide Bureau"), arriving at 8:00 P.M.  From 8:55 P.M. to 12:35 A.M. on November 13, 2012, Tubbins was interviewed by police homicide detectives who offered Tubbins food and drink which Tubbins declined.  Between 9:15 P.M. and 9:45 P.M., Tubbins gave conflicting statements regarding his activities on the night of the homicide, denying any involvement and asserting he was with J.T. at the Community Center until 10:00 P.M.  Tubbins and J.T. then headed toward J.T.'s home in Kenmore,

New York,[4] when Tubbins received a telephone call from his cousin informing Tubbins of the homicide, causing Tubbins and J.T. to drive by the store before going to the girlfriend's home.  Tubbins then claims he received a telephone call regarding the homicide in the middle of the night while at J.T.'s home, and that Tubbins and J.T. then drove to the store before returning to her home where Tubbins remained until 3:00 A.M. on November 13, 2012.  Tubbins also signed a written consent agreeing to give a DNA sample and for the search of his two residences.  No evidence was discovered during a search of Tubbins's first residence.  The mother of Tubbins's two children resided at the second residence, but claimed Tubbins had not been there for several weeks so the second residence was not searched.  Between 11:00 P.M. and 11:23 P.M. on November 12, 2012, Tubbins provided his second sworn statement in which, after being shown still photographs from the security video, Tubbins denied the photographs depicted him, and continued to deny any involvement in the homicide.  At 12:35 A.M., Plaintiff was advised of his *Miranda* rights, Plaintiff then invoked his right to counsel, and the interrogation ceased.

While Plaintiff was being interrogated on November 12, 2012, homicide detectives also interviewed J.T. who stated on November 10, 2012, she and Tubbins were at the Pratt Center[5] and J.T. gave Tubbins a ride to his home, dropping him off at 11:15 P.M.  According to J.T., between 1:18 A.M. and 1:28 A.M. on November 11, 2012, she received a telephone call from Tubbins asking J.T. to pick him up.  When J.T. arrived at Tubbins's home at 1:38 A.M., Tubbins asked J.T. to drive by the store because

---

[4]  The court takes judicial notice that the North Buffalo Community Center is located two blocks south of the village of Kenmore, New York. *See Brisco v. Ercole*, 565 F.3d 80, 83 n. 2 (2d Cir. 2009) (taking judicial notice of distance established by internet mapping service).
[5]  The court takes judicial notice that the "Pratt Center" refers to the Pratt Willard Community Center located at 422 Pratt Street in Buffalo, New York.

someone had informed Tubbins of the shooting.  Tubbins and J.T. then returned to Tubbins's home.  J.T. positively identified Tubbins from a still photograph, but stated she was only 30% certain the photograph was of Tubbins.

At 12:55 A.M. on November 13, 2012, "R.A." appeared at the Homicide Bureau, first identifying himself as Tubbins's brother, but then claiming to be Tubbins's cousin, before stating he and Tubbins were not actually related by blood.  R.A. denied calling Tubbins about the homicide, although R.A. drove by the crime scene at the store and observed the police activity.  R.A. maintained he learned about the homicide later that day from the store's cook, at which time R.A. notified Tubbins.

After Defendant, J.T. and R.A. finished giving their statements, they were allowed to leave.  The homicide case was assigned for prosecution to Defendant Assistant Erie County District Attorney ("ADA") Gary Hackbush ("Hackbush"), who evaluated the police evidence, watched the surveillance video, and prepared a case review ("Case Review") (Dkt. 22-6), summarizing his analysis.  Hackbush submitted the Case Review to Buffalo Police Homicide Bureau Chief James Bargnesi ("Bargnesi"), and Defendant Erie County District Attorney Frank Sedita ("Sedita"), for review.  After reviewing the Case Review, Sedita instructed Hackbush to present the matter to a grand jury, which returned an indictment ("the Indictment")[6] against Tubbins for whom an arrest warrant was issued.  On November 30, 2012, Tubbins was arrested on the warrant for the robbery-homicide and detained at the Erie County Holding Center ("the Holding Center").

On January 22, 2013, the CPS Lab's DNA analysis was completed, showing a mixture of at least two unknown individuals, the major profile of which was of an unknown male.  The DNA analysis was then submitted to the Convicted Offender DNA

---

[6] The date of the Indictment is not in the record.

Index System ("CODIS"), where both the victim and Tubbins were excluded as contributors to the genetic material in the specimen.  A search of the CODIS Local database resulted in a match between the major DNA profile from the swab of a handgun – a .32 caliber pistol[7] – recovered in another criminal case involving four codefendants, prosecuted by ADA Christopher Jurusik ("ADA Jurisik") ("Jurusik's case").  The Lab results also indicated the unknown male could not be excluded as the source of the major DNA profile.  One of the four codefendants in Juruski's case, Ahkeem Huffman ("Huffman"), resembled the person depicted in the security video, and also "bore a striking similarity" to Tubbins.  Case Review at 6.  Hackbush asked Jurusik to abtain from Huffman a buccal swab DNA sample, which Hackbush then had the Lab compare to the DNA sample taken from the door handle.  On February 5, 2013, Hackbush received confirmation from the Lab that Huffman's DNA was on the door handle as well as on the gun used in Jurisik's case.  On February 8, 2013, Plaintiff, who remained at the Holding Center, was granted bail and released on February 9, 2013.  On June 25, 2013, Huffman was indicted for the homicide, and the Indictment against Plaintiff was dismissed on July 18, 2013.  This action followed.

## DISCUSSION

Preliminarily, the court addresses Plaintiff's motion seeking discovery pursuant to Fed.R.Civ.P. 56(d)(2) to oppose summary judgment.  In opposition to summary judgment, Plaintiff moves for discovery pursuant to Fed.R.Civ.P. 52(d), asserting that without affording Plaintiff discovery, Defendants' motion is premature.  Plaintiff's

---

[7] The weapon used in the homicide was a .38 or 9 mm class handgun.

Memorandum at 3-4. In opposing Plaintiff's motion to compel, Defendants argue discovery, with which Defendants have complied, has been timely completed in this matter since August 31, 2015, and Plaintiff, prior to filing the untimely motion to compel, never notified Defendants of any discovery deficiencies, Parker Response Declaration ¶¶ 3-4, 7, 13-18, and, furthermore, the requested discovery is directed toward Plaintiff's parallel action against members of the Buffalo Police Department, *i.e.*, *Tubbins v. Wrest*, 14-CV-00409A(F). *Id.* ¶¶ 8-12. Plaintiff has not argued in further support of the motion.

Rule 56 provides, in pertinent part, that "[i]f a nonmovant shows by affidavit or declaration that, for spedified reasons, it cannot present facts essential to justify its opposition, the court may . . . allow time to obtain affidavits or declarations or to take discovery . . . ." Fed.R.Civ.P. 56(d)(2). A Rule 56(d) affidavit however, must "include the nature of the uncompleted discovery; how the facts sought are reasonably expected to create a genuine issue of material fact; what efforts the affiant has made to obtain those facts; and why those efforts were unsuccessful." *Paddington Partners v. Bouchard*, 34 F.3d 1132, 1138 (2d Cir. 1994) (citing cases). In the instant case, not only has Plaintiff failed to submit the required affidavit in support of his motion, but it is not clear from the papers how the information Plaintiff seeks is at all relevant to resolution of Defendants' motion seeking summary judgment as a matter of law; rather, as Defendants suggest, Parker Response Memorandum ¶¶ 8-12, the information Plaintiff seeks is relevant only to Plaintiff's parallel action against the Buffalo Police Department. Signficantly, Plaintiff does not dispute this argument.

Accordingly, Plaintiff's motion is DENIED.

9

As for Defendants' motion seeking summary judgment, summary judgment of a claim or defense will be granted when a moving party demonstrates that there are no genuine issues as to any material fact and that a moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a) and (b); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250-51 (1986); *Miller v. Wolpoff & Abramson, L.L.P.*, 321 F.3d 292, 300 (2d Cir. 2003).  The court is required to construe the evidence in the light most favorable to the non-moving party.  *Collazo v. Pagano*, 656 F.3d 131, 134 (2d Cir. 2011).  The party moving for summary judgment bears the burden of establishing the nonexistence of any genuine issue of material fact and if there is any evidence in the record based upon any source from which a reasonable inference in the non-moving party's favor may be drawn, a moving party cannot obtain a summary judgment.  *Celotex*, 477 U.S. at 322; *see Anderson*, 477 U.S. at 247-48 ("summary judgment will not lie if the dispute about a material fact is "genuine," that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party").  "A fact is material if it 'might affect the outcome of the suit under governing law.'"  *Roe v. City of Waterbury*, 542 F.3d 31, 35 (2d Cir. 2008) (quoting *Anderson*, 477 U.S. at 248).

"[T]he evidentiary burdens that the respective parties will bear at trial guide district courts in their determination of summary judgment motions."  *Brady v. Town of Colchester*, 863 F.2d 205, 211 (2d Cir. 1988)).  A defendant is entitled to summary judgment where "'the plaintiff has failed to come forth with evidence sufficient to permit a reasonable juror to return a verdict in his or her favor on'" an essential element of a claim on which the plaintiff bears the burden of proof.  *In re Omnicom Group, Inc., Sec.*

*Litig.*, 597 F.3d 501, 509 (2d Cir. 2010) (quoting *Burke v. Jacoby*, 981 F.2d 1372, 1379 (2d Cir. 1992)).   Once a party moving for summary judgment has made a properly supported showing of the absence of any genuine issue as to all material facts, the nonmoving party must, to defeat summary judgment, come forward with evidence that would be sufficient to support a jury verdict in its favor.   *Goenaga v. March of Dimes Birth Defects Foundation*, 51 F.3d 14, 18 (2d Cir. 1995).   "[F]actual issues created solely by an affidavit crafted to oppose a summary judgment motion are not 'genuine' issues for trial."   *Hayes v. New York City Dept. of Corrections*, 84 F.3d 614, 619 (2d Cir. 1996).

In support of summary judgment, Defendants argue the First Claim is not asserted against any Defendant named in this action, Defendants' Memorandum at 3-4, the Second Claim against the DA's Office is barred because the DA's Office is not a suable entity and based on Eleventh Amendment immunity, *id.* at 4-5, and the Individual Defendants are absolutely immune from liability on the Third through Seventh Claims because the conduct of which Plaintiff complains was within the scope of the Individual Defendants' prosecutor and advocacy duties, *id.* at 5-9.   Defendants alternatively maintain that insofar as Plaintiff has asserted claims against the Individual Defendants under New York law, the Individual Defendants enjoy either qualified or absolute immunity from liability on such claims, *id.* at 9-13, the Seventh Claim is time-barred, *id.* at 13, and, alternatively, the state law claims should be remanded to New York Supreme Court, *id.* at 13-14.   Plaintiff argues summary judgment should be denied because precedent establishes Plaintiff's constitutional claims are viable because were it not for the customs and practices of Defendants, Plaintiff never would have been

arrested or incarcerated and, thus, would not have been injured.  Plaintiff's

Memorandum at 19.  Plaintiff does not, however, dispute that the the First Claim is not

asserted against any named Defendant, or that the action cannot be maintained against

the DA's Office.  In further support of summary judgment, Defendants argue there are

no genuine issues of material fact calling into question whether Defendants were

involved in the investigation of the homicide, such that Defendants' conduct relevant to

this action was limited to that of prosecutor for which Defendants are absolutely immune

from liability.  Parker Reply Declaration ¶¶ 13-32.

      As Defendants argue, Defendants' Memorandum at 3-4, and Plaintiff does not

dispute, the First Claim is asserted "against the individual police officers for violations of

[Plaintiff's] constitutional rights," yet no police officers are named as defendants to this

action; rather, the Defendants to this action include the DA's Officer, Sedita, and

Hackbush.  Summary judgment is thus GRANTED in favor of Defendants on the First

Claim.

      With regard to the Second Claim, as Defendants assert, Defendants'

Memorandum at 4-5, the DA's Office is immune under the Eleventh Amendment from

liability in this action.  In particular, absent a waiver of its immunity, the Eleventh

Amendment bars claims against a state.  *Kentucky v. Graham*, 473 U.S. 159, 165

(1985).  "The immunity recognized by the Eleventh Amendment extends beyond the

states themselves to 'state agents and state instrumentalities' that are, effectively, arms

of a state."  *Woods v. Rondout Valley Cent. Sch. Dist. Bd. of Educ.*, 466 F.3d 232, 236

(2d Cir. 2006).  Immunity under the Eleventh Amendment "does not, however, extend to

suits prosecuted against a municipal corporation or other governmental entity which is

not an arm of the state." *Mulvihill v. New York*, 956 F.Supp.2d 425, 427 (W.D.N.Y. 2013) (hodling § 1983 claims against Ontario County Depratment of Social Services not barred by Eleventh Amendment immunity).   Nevertheless, a county District Attorney's Office has been held to be an agency of New York State.   *See Brims v. Ramapo Police Dept.*, 2011 WL 7101233, at * 7 (S.D.N.Y. Dec. 23, 2011) (citing *Ying Jing Gan v. City of New York*, 996, F.2d 522, 536 (2d Cir. 1993) ("When prosecuting a criminal matter, a district attorney in New York State, acting in a quasi-judicial capacity, represents the State not the county.")); and *Woodward v. Office of District Attorney*, 689 F.Supp.2d 655, 659 (S.D.N.Y. 2010) (holding the New York County District Attorney's Office is an agency of New York State such that the plaintiff's § 1983 claims against it are barred by the Eleventh Amendment).   As such, in the absence of any evidence the DA's Office has waived its Eleventh Amendment rights, including immunity from suit, and no such evidence is present here, the Eleventh Amendment bars Plaintiff's claims against the DA's Office.

Defendants argue that absent any evidence that Individual Defendants engaged in investigative, rather than prosecutorial conduct, Individual Defendants are absolutely immune from liability on Plaintiff's claims.   Defendants' Memorandum, *passim*.   "A prosecutor acting in the role of an advocate in connetion with a judicial proceeding is entitled to absolute immunity for all acts 'intimately associated with the judicial phase of the criminal process.'"   *Simon v. City of New York*, 727 F.3d 167, 171 (2d Cir. 2013) (quoting *Imbler v. Pachtman*, 424 U.S. 409, 430 (1976)); *see also Dory v. Ryan*, 25 F.3d 81, 83 (2d Cir. 1984) ("[A]bsolute immunity protects a prosecutor from § 1983 liability for virtually all acts, regardless of motivation, associated with his function as an advocate.").

"These functions include deciding whether to bring charges and presenting a case to a grand jury or a court, along with the tasks generally considered adjunct to those functions, such as witnss preparation, witness selection, and issuing subpoenas." *Simon*, 727 F.3d at 171 (citing *Imbler*, 424 U.S. at 431, n. 33). "Absolute immunity also extends to persons 'who act under [a prosecutor's direction in performing functions closely tied to the judicial process.'" *Id.* (quoting *Hill v. City of New York*, 45 F.3d 653, 660 (2d Cir. 1995)). In contrast, "prosecutors receive only qualified immunity when performing 'administrative duties and those investigatory functions that do not relate to an advocate's preparation for the initiation of a prosecution or for judicial proceedings.'" *Id.* at 172 (quoting *Buckley v. Fitzsimmons*, 509 U.S. 259, 273 (1993)). "Investigation, arrest, and detention have historically and by precedent been regarded as the work of police, not prosecutors, and 'they do not become prosecutorial functions merely because a prosecutor has chosen to participate.'" *Id.* (quoting Day v. Morgenthau, 909 F.2d 75, 77-78 (2d Cir. 1990)). Nor is absolute immunity "available 'for the act of giving legal advice to the police in the investigative phase of a criminal case, or for assisting in a search and seizure or arrest.'" *Id.* (quoting Hill, 45 F.3d at 661). In the instant case, the record is completely devoid of any evidence demonstrating any genuine issue of material fact even remotely suggesting that either Hackbush or Sedita was involved in giving legal advice to the police or participating in the investigation of the homicide or in Plaintiff's arrest such that both Individual Defendants are absolutely immune from liability in this action.

In particular, upon being assigned as lead prosecutor of homicides in the DA's

Office, Hackbush reported to ADA James Bargnesi ("Bargnesi").  Hackbush Dep. Tr.[8] at

20-21.  Hackbush maintains that in prosecuting homicides, he followed policies that

were not written down or maintained in any policies and procedures manual but, rather,

were established or maintained by Bargnesi.  Id. at 21-23.  Hackbush explains that in

prosecuting a homicide, he interviewed the police officers who investigated the crime

and reviewed evidence gathered by the police officers, sometimes speaking with the

witnesses if available.  Id. at 23-24.  Hackbush then prepared a memorandum ("case

review") to Bargnesi detailing the evidence, proof, and any legal arguments, and the

case review was reviewed by Bargnesi and the DA.  Id. at 24, 53.  According to

Hackbush, the decision to present a case to a grand jury was made by the DA.  Id. at

24.  The DA informed Bargnesi of the decision to prosecute, who then directed

Hackbush to present the case to the grand jury.  Id. at 25.  With regard to the

investigation and indictment of Plaintiff, Hackbush stated that he met the investigating

police detectives on November 11, 2012, the day after the homicide, at the Homicide

Bureau where Police Detective Michael Mordino ("Mordino"), played the security video

for Hackbush to review.  Id. at 43-47.  Hackbush stated the Police were still attempting

to identify the shooter, but was not privy to the methods used to determine the shooter

was Tubbins.  Id. at 47-48.  Hackbush denied any involvement in the police

interrogation of Tubbins on November 12-13, 2012.[9]  Id. at 51.  Hackbush also

steadfastedly denied any involvement in the homicide investigation, including that

---

[8] Refernces to "Hackbush Dep. Tr." are to the pages of the transcript of Hackbush's deposition, a copy of which is filed as Defendants' Exh. B (Dkt. 22-5), and Plaintiff's Exh. F (Dkt. 24-6).
[9] There is an apparent discrepancy in the record as to whether Plaintiff was initially interviewed by the Police on November 12, 2012, or November 17, 2012.

Hackbush did not direct the Police as to how to determine the shooter's identity, or to obtain DNA samples from the door handle, repeatedly asserting the Police "do that on their own." *Id.* at 52-58. According to Hackbush, his involvement was limited to inquiring whether any samples were sent to the Lab for analysis and, upon learning samples had been submitted, Hackbush would have waited for the results, but Hackbush was not aware how long it took for Lab samples to be processed, *id.* at 58-59, Hackbush never requested the Lab expedite its processing of any samples, and the DA's Office does not test for DNA. *Id.* at 60. Hackbush specifically denied any involvement in obtaining the DNA sample from the door handle, submitting it to the Lab for processing, inquiring of the Lab as to the status of the sample, or requesting the Lab expedite processing the sample. *Id.* at 61. According to Hackbush, that the DNA analysis results showed another person's DNA was on the door handle did not necessarily exonerate Tubbins as the shooter because the person whose DNA was on the door handle was not necessarily the last person to touch the door handle. *Id.* at 70-71. It was not until January 22, 2013, that Hackbush received the CODIS notice indicating the DNA retrieved from the door handle matched a person in the DOCIS data base, after which Hackbush met with Jurusik, the ADA assigned to the case in which the DNA match was a defendant. *Id.* at 72. Hackbush reviewed Jurusik's case and observed one of the four defendants in Jurusik's case bore a striking resemblance to Tubbins, *id.* at 72-73, and both looked very similar to the shooter depicted in the security video. *Id.* at 84-85. Jurusik, at Hackbush's request, then arranged for Huffman's DNA sample to be obtained for analysis by the Lab, the results of which, received on February 5, 2013, were consistent with Huffman. *Id.* at 72-74. Hackbush

informed Tubbins's attorney of this recent discovery and Tubbins was released from the

Holding Center on February 8, 2013. *Id.* at 73. Hackbush emphasized that Jurusik did

not obtain Huffman's DNA sample, but obtained the required court order to show cause

permitting the Police investigator to obtain Huffman's DNA sample. *Id.* at 75. Once

Huffman's DNA sample was obtained, Hackbush telephoned the Lab and spoke with

Maria Orsino, requesting that analysis of the sample be expedited, *id.* at 76, although

Hackbush never made a similar request that analysis of the initial DNA sample from the

door handle be expedited. *Id.* at 77. According to Hackbush, it was possible that

Huffman's DNA was found on the door handle because Huffman may have been a

passenger in the vehicle at some point, and further investigation was needed to rule out

that possibility, *id.* at 87; in any event, the presence of Huffman's DNA on the door

handle did not confirm that Huffman perpetrated the homicide. *Id.* at 90. Although the

DA's Office maintained no official policy regarding how to proceed upon discovering

potentially exculpatory evidence, Hackbush explained that the DA's Office had an

ethical obligation under *Brady v. Maryland*, 373 U.S. 83 (1963) ("Brady"), to investigate

such evidence, and it is that obligation that prompted Hackbush to call for further

investigation once the results of the analysis of the DNA sample were received on

January 22, 2013, indicating someone other than Tubbins had touched the door handle.

*Id.* at 88-89. Hackbush recalled no conversations with Sedita regarding the homicide

prosecution of Tubbins, *id.* at 89, and denied collecting any evidence in the case. *Id.* at

102.

Accordingly, the record is devoid of any evidence that either Hackbush or Sedita

participated in the investigation of the homicide. Rather, the record establishes that

Hackbush solely relied on information provided by the Police in preparing the Case Review upon which Sedita, after conferring with Bergnasi, made the decision to submit the case to the Grand Jury.  Significantly, Plaintiff does not challenge the credibility of Hackbush's deposition testimony.  Nor does Plaintiff point to any evidence creating a material issue of fact regarding the Individual Defendants' version of their involvement in prosecuting Plaintiff for the homicide.  Furthermore, insofar as Hackbush called for further investigation of the DNA evidence once the results of the analysis of the DNA sample were received on January 22, 2013, indicating someone other than Tubbins had touched the door handle, Hackbush Dep. Tr. at 88-89, as Hackbush explains, *id.*, he undertook such action not in furtherance of the criminal action against Tubbins but, rather, to fulfill his ethical obligation under *Brady* regarding potentially exculpatory evidence.  *See Warney v. Monroe County*, 587 F.3d 113, 126 (2d Cir. 2009) (holding prosecutors who delayed disclosing exculpatory DNA results and fingerprints analysis while prisoner's post-conviction moiton to compel DNA testing and federal habeas petition were pending, were entitled to absolute immunity from liability in prisoner's § 1983 action alleging such delay violated due process).  That Hackbush contacted Plaintiff's defense attorney as soon as the results of the second DNA analysis were obtained pointing to Huffman as the shooter establishes that Hackbush endeavored to see that Plaintiff was released as quickly as possible from the Holding Center.  Defendants' motion should thus be GRANTED as to Hackbush and Sedita.

Finally, with regard to Plaintiff's remaining state law claims, "[i]n general, where the federal claims are dismissed before trial, the state claims should be dismissed as well." *N.Y. Mercantile Exch. Inc. v. Intercontinental Exch., Inc.*, 497 F.3d 109, 119 (2d

Cir. 2007) (internal quotation omitted).  *See also Carnegie-Mellon University v. Cohill*, 484 U.S. 343, 350 n. 7 (1988) (noting where all federal claims have been dismissed under federal law, the district court has discretion whether to exercise supplemental jurisdiction over pendent state law claims, based on consideration of several factors, including "judicial economy, convenience, fairness, and comity").  In the instant case, the same absolute immunity barring this action against Individual Defendants would also bar the state law claims against Defendants, whether in this court or in New York Supreme Court.  *See Shmueli v. City of New York*, 424 F.3d 231, 238 (2d Cir. 2005) (holding absolute immunity also applies to state law claims).  Accordingly, the court will not refrain from exercising pendent jurisdiction over the state law claims, all of which are inextricably intertwined with Plaintiff's federal claims for which Defendants are absolutely immune.  As such, Defendants are also absolutely immune from liability on Plaintiff's state law claims.  Defendants' motion is GRANTED with regard to the state law claims.

## CONCLUSION

Based on the foregoing, Defendants' motion (Dkt. 22), is GRANTED; Plaintiff's motion (Dkt. 24), is DENIED.  The Clerk of the Court is directed to close the file.

SO ORDERED.

/s/ *Leslie G. Foschio*

_____

LESLIE G. FOSCHIO
UNITED STATES MAGISTRATE JUDGE

DATED:       September 29, 2016
             Buffalo, New York